1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PAGEMELDING, INC.,

        Plaintiff,

  v.

FEEVA TECHNOLOGY, INC. ET AL,

        Defendant.

_____/

No. C 08-03484 CRB

**CLAIM CONSTRUCTION ORDER**

This suit involves the alleged infringement by Defendant Microsoft Corp. of U.S. Patent No. 6,442,577 ("the '577 Patent") owned by Plaintiff PageMelding Inc.  The '577 Patent is titled "Method and Apparatus for Dynamically Forming Customized Web Pages for Web Sites."  In layman's terms, the Patent involves a process for providing customized information to Internet users.  Now before the Court is the task of claim construction.  There are five claim terms or phrases to be construed.  The tutorial and claim construction hearing were held on August 18, 2009.

BACKGROUND

PageMelding is a subsidiary of Front Porch, Inc., a company that specializes in customer messaging and advertising solutions for Internet providers.  The application for the '577 Patent was filed in November 1998, and the Patent was issued in August 2002.  The Patent's "Field of the Invention" states:

United States District Court
For the Northern District of California

1
2
    The present invention relates generally to forming web pages at Internet
    Content Provider (ICP) web sites, and more specifically to forming web pages
    for Internet Service Providers (ISPs) and organizations having direct access to
    the Internet.

3   '577 Patent at 1:5-10.

4        The Internet is made up of complex networks of computers, modems, and servers.

5   Various points throughout the networks help add structure to the Internet.  These structuring

6   points are referred to as nodes.  Examples of "nodes" include, among other things, a user's

7   computer, a modem, an Internet Content Provider, and an Internet Service Provider.

8        An Internet Content Provider ("ICP") hosts much of the information that is displayed

9   to Internet users.  ICPs include for-profit entities, non-profit entities, and individuals.

10  Advertising is a major source of revenue for ICPs that operate for-profit, such as Google or

11  Yahoo!.  The more people that visit a website, the more that an ICP can charge for

12  advertising.  Plaintiff asserts that "the theory behind the '577 Patent" is that "by providing

13  generic or 'canned' content in combination with content of heightened relevance to the user

14  requesting the Web page, an ICP can attract and retain a larger audience or charge more for

15  advertising."  Pl. Br. at 2.

16       An Internet Service Provider ("ISP") connects users to the Internet.  An ISP can be an

17  entity that is dedicated to providing access to the Internet, such as AOL, or an entity that

18  provides multiple services, such as a cable company.  Some organizations, such as

19  corporations, governmental entities, and universities, have installed their own systems so that

20  they may access the Internet without using ISPs. The ISP or organization assigns an Internet

21  Protocol ("IP") address to its users.  This IP address allows content to be routed to the user.

22  Through the IP address, it is possible to determine the geographic location of the user making

23  a request for specific Internet content.

24        When a user opens a web browser, the user's computer creates a message that is

25  routed to the Internet through the ISP, requesting specific web content.  The "service

26  request" includes the IP address of the device originating the service request, a destination

27  address for the web page the user is attempting to view, and the information being requested.

28

2

1   The message is routed to a web server.  A return message is then assembled, which displays

2   content on the user's computer.

3         ISPs and organizations connected to the Internet often have their own web sites.

4   However, the tendency is for users to leave the ISP's web site and go to an ICP's web site to

5   search for desired information.  "Accordingly, it is desirable to dynamically form customized

6   web pages at an ICP web site to satisfy different needs and requirements for different ISPs

7   and organizations."  '577 Patent at 1:64-2:1.  "The ISP, or the organization, could get a much

8   better Internet portal that provides value added services to its subscribers or internal users,

9   without having negative impacts on its business.  The ICP, in turn, would receive increased

10  traffic."  Id. at 2:3-7.

11        At times, in response to a service request, ICPs send "cookies" to be placed on a

12  user's computer.  A "cookie" enables the ICP to retrieve information about the user and use

13  this information to target specific web content in the future.  Many users block cookies from

14  being installed on their computers.  The '577 Patent provides a mean by which content

15  providers can enhance the targeted information available on their web sites, independent of

16  cookies.  The "Summary of Invention" states:

17        To address the shortcomings of the prior art, the present invention provides
          improved methods for dynamically forming customized web pages for ISPs,
18        and organizations that have direct access to the Internet.

19  '577 Patent at 2:18-21.

20        On July 21, 2008, Plaintiff PageMelding filed suit against Defendants Feeva

21  Technologies, Inc., Hitwise USA, Inc., Kindsight, Inc., Microsoft Corp., and NebuAd Inc.

22  for patent infringement.  Microsoft is the only active defendant remaining as PageMelding

23  and Kindsight have filed a Joint Motion to Stay Proceeding, NebuAd no longer exists as an

24  entity, and Hitwise USA and Feeva Technologies have settled the claims against them.

25  ///

26  ///

27  ///

28  ///

3

1

DISCUSSION

2    I.    Legal Standards for Claim Construction

3            Patent infringement analysis involves two steps.  The first step is to construe the

4    asserted claims and the second step is to determine whether the accused method or product

5    infringes any of the claims as properly construed.  See Markman v. Westview Instruments,

6    Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996).  The first step,

7    construction of the patent claims, is a matter of law and thus the responsibility of the court.

8    See id. at 979.  "When the parties present a fundamental dispute regarding the scope of a

9    claim term, it is the court's duty to resolve it."  O2 Micro Int'l Ltd. v. Beyond Innovation

10   Tech. Co., 521 F.3d 1351, 1362 (Fed. Cir. 2008).  The goal of claim construction is to

11   determine what an ordinary artisan, reading the entirety of the patent, would regard as the

12   claimed invention.  Astrazeneca AB, Aktiebolaget Hassle, KBI-E, Inc. v. Mutual Pharm. Co.,

13   384 F.3d 1333, 1337 (Fed. Cir. 2004).

14           "In interpreting an asserted claim, the court should look first to the intrinsic evidence

15   on record, i.e., the patent itself, including the claims, the specification and, if in evidence, the

16   prosecution history."  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir.

17   1996); see also Phillips v. AWH Corp., 415 F.3d 1301, 1314 (Fed. Cir. 2005) (en banc).  In

18   examining the intrinsic evidence, the court should first look to the words of the claims

19   themselves to define the scope of the patented invention.  See Phillips, 415 F.3d at 1312 ("It

20   is a 'bedrock principle' of patent law that the claims of a patent define the invention to which

21   the patentee is entitled the right to exclude.") (internal quotation omitted).  Words in a claim

22   "are generally given their ordinary and customary meaning."  Id.

23           Next, the court should review the patent specification "to determine whether the

24   inventor has used any terms in a manner inconsistent with their ordinary meaning."

25   Vitronics, 90 F.3d at 1582.  "The specification acts as a dictionary when it expressly defines

26   terms used in the claims or when it defines terms by implication."  Id.  The Federal Circuit

27   teaches us that "the specification is always highly relevant to the claim construction analysis.

28   Usually it is dispositive; it is the single best guide to the meaning of a disputed term."  Id.;

see also Phillips, 415 F.3d at 1315.  A court must be wary not to import limitations from the specification into the claims.  Prima Tek II LLC v. Polypap, SARI, 412 F.3d 1284, 1289 (Fed. Cir. 2005); see also RF Del., Inc. v. Pac. Keystone Techs., Inc., 326 F.3d 1255, 1264 (Fed. Cir. 2003) ("A basic claim construction canon is that one may not read a limitation into a claim from the written description.").  Yet, "[t]o properly determine the ordinary meaning of the entire phrase at issue" the court "must consider the claim terms in light of the entire patent."  Netcraft Corp. v. eBay, Inc., 549 F.3d 1394, 1397 (Fed. Cir. 2008).

The third type of intrinsic evidence that the court may consider is the prosecution history of the patent, if it is in evidence.  Phillips, 415 F.3d at 1317.  The prosecution history contains the entire record of the prosecution of the patent claim before the patent office, including any representations about the scope of the claim or the meaning of certain terms made by the applicant.  Nystrom v. TREX Co., 424 F.3d 1136, 1144 (Fed. Cir. 2005).  An applicant is held to the statements it makes during prosecution to distinguish the prior art.  Id.

Ordinarily, the intrinsic evidence alone will resolve any ambiguity in a disputed term.  Where the intended meaning of a term is revealed by the context of the specification and other intrinsic evidence, "it is improper to read the term to encompass a broader definition simply because it may be found in a dictionary, treatise, or other extrinsic source."  Id. at 1145.  By relying first on the claim language, the specification, and the prosecution history, a court can protect a patentee's rights while at the same time enabling the public to rely on the public record of the patentee's claim.  "In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention."  Vitronics, 90 F.3d at 158 (citing Markman, 52 F.3d at 978-79).  "Only if there [is] still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence, should the trial court[] resort[] to extrinsic evidence."  Id. at 1584; see Key Pharm. v. Hercon Labs Corp., 161 F.3d 709, 716 (Fed. Cir. 1998) (noting that extrinsic evidence is appropriate if the intrinsic evidence "does not answer the question").

**United States District Court**
For the Northern District of California

II.    Claim Construction

The parties have identified five terms, clauses or phrases that require construction by the Court: (1) "page file"; (2) "first type network node"; (3) "second type network node"; (4) "for the first type network node"; and (5) "for the second type network node."  The disputed terms appear in Claim 1 as follows:

> A method for dynamically forming customized web pages **for a first type network node** at a **second type network node**, comprising the steps of:
>
> forming at least a **page file for the first type network node**;
>
> forming at least a **page file for the second type network node**;
>
> receiving a service request from the **first type network node**;
>
> identifying the **first type network node** based on the service request; and
>
> forming a customized **page file** formed **for the first type network node** by including the **page file** formed **for the first type network node** within the **page file for the second type network node**.

Each of the five terms or phrases is discussed below, considering each party's proposed construction.

A.    "page file" (Claims 1, 4, 5)

**Plaintiff:**       A data element constituting at least a portion of a Web page and/or instructions for displaying content on a computer.

**Defendant:**    A Web page file, such as an HTML file.

The Court adopts Defendant's construction.  The claims of the '577 patent all refer to forming customized "web pages."  Claim 1, for example, claims a method for forming customized "web pages" through forming page files.  '577 Patent at 9:47-49. The only "page files" described in the Patent are web page files.  For example, the Abstract states that "the ICP stores web page files designed for itself and its participating web sites."  Id. at Abstract. The Abstract continues with: "Upon receiving a service request from a participating web site, the ISP dynamically forms customized web pages for the participating web site by combining the page files designed for itself and the page files designed for the participating web site." Id.  The specification goes on to state:

6

Typically, a website stores information in a **set of web page files**, such as HTML, SHTML, DHTML, or CGI files. . . .  A **web page file** may contain one or more page links containing the path information to other web page files in the same web site.  Thus, using a web browser, a user can access a **home page file (the page file at the root level) of a web site**.  From the home page, the user can browse subsequent **web page files** by selecting links contained in the home page file.  The **subsequent web page files** may further contain one or more page links, which can be further selected to browse web page files at the next level.  At any level, a browser can browse back to the **previous web page file and re-select page links from the previous web page file.**  A web page may contain page links (foreign page links) containing path information to the web pages of the other web sites.  Upon selecting a foreign page link contained in a web page file, a service request is sent to the web site indicated by the path information in the foreign page link, to retrieve the web page in the foreign web site.

**In addition, a web page file may contain links to other types of files, such as AVI, GIF, JPEG, and PNG files** . . . **A web page file may also contain applets.  Upon receiving a web page file, a web browser can display it as a web page on a user computer**.

Id. at 5:14-43.  Again, the only "page files" mentioned are "web page files."

Plaintiff complains that by adopting Microsoft's position, the Court is reading in an example from the patent's specification into the claim.  See RF Del., 326 F.3d at 1264.  The Federal Circuit has recognized "that the distinction between using the specification to interpret the meaning of a claim and importing limitations from the specification into the claim can be a difficult one to apply in practice."  Phillips, 415 F.3d at 1323.  "However, the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms."  Id.  Upon reading a specification, "it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive."  Id.

Here, Plaintiff emphasizes the portion of the specification that expressly distinguishes a "web page file" from "other types of files, such as AVI, GIF, JPEG, and other PNG files." Id. at 5:35-37.  Yet this passage does not describe another type of page file, it merely describes other types of files.  The only kind of "page file" described in the specification is a "web page file."  Accordingly, by construing "page file" as a "web page file," the Court is not importing a limitation from the specification – it is looking to the only type of page file

7

United States District Court
For the Northern District of California

referenced in the specification.  It is clear from the specification that there was nothing in the context to indicate that the patentee contemplated any alternative embodiment to the one presented by Defendant.  See Phillips, 415 F.3d at 1323; see also Decisioning.com, Inc. v. Federated Dep't Stores, Inc., 527 F.3d 1300, 1308 (Fed. Cir. 2008) (construing broad term narrowly in light of the more limited language of the specification).

Plaintiff further argues that "claim 1 clearly indicates that more than one page file may make up the ultimate Web page," see Pl. Br. at 12, but that assertion is not in dispute. Microsoft agrees that multiple web page files may be combined to create a single customized web page.  What is in dispute, rather, is what constitutes a "page file" as claimed in the '577 Patent.  Reading the patent in its entirety supports a construction that "page file" would mean "web page file" to an ordinary person skilled in the art.  See Netcraft, 549 F.3d at 1397 ("In order to properly determine the ordinary meaning of the entire phrase at issue in this case, we must consider the claim in light of the entire patent.").

Finally, Plaintiff complains that the Court should not adopt Defendant's construction because it uses the term to be construed, "page file," within the construction, "a web page file."  The Court's task at claim construction is to determine the specific meaning of a term or phrase used within the Patent.  When a party uses a broad or ambiguous term, part of the Court's function is to see whether there is a more specific definition that should apply.  The term "page file" could, theoretically, encompass far more than what is contemplated by the claim.  Accordingly, it is entirely proper for the Court to refine the term so that its construction comports with the intrinsic evidence.

The Court further notes that Plaintiff's proposed construction is unsatisfactory. Plaintiff fails to cite intrinsic evidence supporting its construction.  Neither "data element" nor "instructions for displaying content" appears anywhere in the '577 Patent.  Plaintiff has not provided other evidence suggesting that a person of ordinary skill in the art would assign its definition to the phrase "page file."  Moreover, Plaintiff's construction adds ambiguity rather than clarity to the claim.  It includes new, undefined terms which could require further construction by the Court.

1       In reading the Patent in its entirety, the Court concludes the term "page file" shall be

2   construed as a Web page file, such as an HTML file.

3       B.    "first type network node" (Claims 1, 2, 3, 6)

4       **Plaintiff:**    One or more computer devices on a computer network.

5       **Defendant:**    A participating Internet Service Provider (ISP) or organization from

6           which a service request is received.

7       "second type network node" (Claims 1, 2, 3)

8       **Plaintiff:**    One or more computer devices on a computer network.

9       **Defendant:**    An Internet Content Provider (ICP).

10       1.    Defendant's Construction Applies

11       The Court adopts Defendant's construction, with one modification, discussed below.

12   In large part, Defendant's construction finds significant support in the intrinsic evidence.

13   Claim 1 specifies that the first type network node is the node from which a service request is

14   received, and that the first type network node is identified based upon the service request.

15   '577 Patent 9:53-57.  In every embodiment described, the first type network node from

16   whom a service request is received is an ISP or organization node that is identified by that

17   request, and the customization of the web page is done by the ICP.  Id. at 6:16-55; 7:20-23;

18   8:60-63.  The "Field of the Invention" describes the "present invention" as relating to

19   "forming web pages for Internet Service Providers (ISPs) and organizations."  Id. at 1:6-10.

20   The "Summary of the Invention" states that "the present invention provides improved

21   methods for dynamically forming customized web pages for ISPs, and organizations that

22   have direct access to the Internet."  Id. at 2:18-21.

23       Although a limitation in a specification should not be read to limit broad language in a

24   claim, statements about "the present invention" as a whole may limit the claims.  Honeywell

25   Int'l, Inc. v. ITT Indus., Inc., 452 F.3d 1312, 1318 (Fed. Cir. 2006); Andersen Corp. v. Fiber

26   Composites, LLC, 474 F.3d 1361, 1367-68 (Fed. Cir. 2007) (looking to specification

27   language detailing a "critical element" in the process, "not merely a preferred embodiment").

28   "[W]hen a patentee uses a claim term throughout the entire patent specification, in a manner

United States District Court
For the Northern District of California

1  consistent with only a single meaning, he has defined that term by implication." <u>Bell Atl.</u>

2  <u>Network Serv., Inc. v. Covad Comm'n Group, Inc.</u>, 262 F.3d 1258 (Fed. Cir. 2001) (internal

3  quotation marks omitted).  In the specification, there is no discussion of a "network node"

4  aside from ICPs, ISPs, and organizations that are connected to the Internet.  Reading the

5  Patent in its entirety, it is hard to envision an application of the method that would not

6  involve an ICP, ISP, or organization connected to the Internet.  <u>See</u> <u>Netcraft</u>, 549 F.3d at

7  1399 (noting there was "no language in the specification, much less express language,

8  indicating that the [claim terms] were meant to disclose an alternative embodiment").

9      The prosecution history further supports Defendant's position.  In prosecuting the

10  Patent, the inventors submitted a response to the Patent and Trademark Office's initial

11  rejection of the '577 Patent as anticipated by an earlier patent, the "Tobin Patent."  The

12  Tobin Patent also describes a method for generating customized marketing services through

13  web pages.  The patent examiner opined that, like Claim 1 of the '577 Patent, "Tobin teaches

14  combining content from files from different Internet service/content providers to form a

15  customized web page for the client accessing that page."  '577 Patent File History (11/7/01

16  Office Action).

17      In response, Plaintiff distinguished the role of the ISP in Tobin from the ISP in its

18  alleged invention.  The Tobin Patent focuses on a <u>user's</u> request, whereas in Plaintiff's patent

19  the <u>ISP</u> is itself the so-called "marketing participant" that provides the service request.  <u>Id.</u>

20  (2/8/02 Office Action).  Specifically, Plaintiff argued that "the Tobin patent fails to disclose

21  or suggest that the node from which the service request is received is a 'market participant'

22  for which content is dynamically configured at a second node."  <u>Id.</u>  In other words, whereas

23  in Tobin custom content for a flower shop is displayed, in the '577 Patent it is custom

24  content for the <u>ISP</u>, which relays the user's service request over the Internet, that is displayed

25  to the user.

26      To support its argument in the patent prosecution, Plaintiff focused on the "receiving"

27  language in its claims, explaining that a user's request for web content is actually received at

28  the content server from an ISP.  <u>Id.</u>  Highlighting the different roles of the ISP in the

10

respective patents, Plaintiff drew a figure showing that in the '577 Patent, the ICP receives a service request from an ISP, rather than an individual user.  Plaintiff asserted to the examiner that "the Tobin patent fails to disclose forming customized web pages for an ISP or organization node from which a service request is received."  Id.  The representations made by Plaintiff during prosecution support the Defendant's contention that the network nodes referred to in Claim 1 are more limited than Plaintiff now suggests.

### 2.    Claim Differentiation

Plaintiff's main complaint with adopting Defendant's construction is that it runs afoul of the canon of claim differentiation.  "Under the doctrine of claim differentiation, each claim in a patent is presumptively different in scope."  Wenger Mfg., Inc. v. Coating Machinery Sys., Inc., 239 F.3d 1225, 1233 (Fed. Cir. 2001).  "[T]he presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim."  Liebel-Flarshiem Co. v. Medrad, Inc., 358 F.3d 898, 910 (Fed. Cir. 2004).  "[W]here the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its highest."  Id.

"Where some claims are broad and others narrow, the narrow claim limitations cannot be read into the broad whether to avoid invalidity or to escape infringement."  Uniroyal, Inc. v. Rudkin-Wiley, Corp., 837 F.2d 1044, 1054-55 (Fed. Cir. 1998).  Yet "the doctrine of claim differentiation cannot broaden claims beyond their correct scope determined in light of the specification and the prosecution history and any relevant extrinsic evidence."  Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1370 (Fed. Cir. 2007) (internal quotation omitted).

Plaintiff argues that accepting Defendant's construction would render the claims dependent on Claim 1 wholly redundant.  Claim 2 is "[t]he method of claim 1, wherein the first type network node is an ISP node, and the second type network node is an ICP node."  Id. 9:62-64.  Claim 3 is "[t]he method of claim 1, wherein the first type network node is an organization node, and the second type network node is an ICP node."  Id. 9:65-67.  Under

1    Plaintiff's argument, the presence of these limitations in Claims 2 and 3 suggests that such

2    limitations are not part of Claim 1, contrary to Defendant's narrow construction.

3         The Court finds that the doctrine of claim differentiation does not apply here because

4    Defendant's proposed construction does not make the two claims identical in scope.  See

5    Sinorgchem Co., Shandong v. Int'l Trade Com'n, 511 F.3d 1132, 1140 (Fed. Cir. 2007)

6    (holding claim differentiation did not apply where a claim refers only to a subset of the terms

7    in another claim and is significantly narrower in scope).  Under Defendant's construction, the

8    "first type network node" can either be an ISP node or an organization node.  Claims 2 and 3

9    then narrow the scope of Claim 1 by separately claiming use of each combination.  Claim 2

10   expressly applies when the first type network node is an ISP, whereas Claim 3 applies where

11   the first type network node is an organization node.  See '577 Patent 9:62-67.  Because there

12   is no exact identity between the claims under Defendant's construction, the canon of claim

13   differentiation does not apply.

14        The Court further holds that, even if claim differentiation does apply, it is not

15   controlling in this case.  "[C]laim differentiation is not a hard and fast rule of construction,

16   and cannot be relied upon to broaden claims beyond their correct scope."  Wenger, 239 F.3d

17   at 1233 (internal quotations omitted).  For example, in University of California v.

18   Dakocytomation Cal., the court refused to permit the doctrine of claim differentiation to

19   overcome intrinsic evidence in construing claims.  517 F.3d 1364, 1375 (Fed. Cir. 2008).

20   The doctrine sets forth a rebuttable presumption regarding the relationship between claim

21   terms used in related claims, but the doctrine should not contradict intrinsic evidence in

22   construing claim limitations.  Id.  Given the weight of the intrinsic evidence supporting

23   Defendant's construction, the Court rejects Plaintiff's argument that claim differentiation

24   controls the outcome in this matter.

25        The Court rejects, however, Defendant's inclusion of the word "participating" within

26   its construction of "first type network node."  The Court is simply not convinced that the

27   intrinsic evidence supports reading this limitation into the claim, particularly where claim 7

28

United States District Court
For the Northern District of California

1   clearly provides for a method of web page customization where the "first type network node"

2   participates in the web page customization service." '577 Patent at 10:25-27.

3            3.      Plaintiff's Construction

4        Plaintiff's proposal fails to provide for any distinction between the two terms.  Each

5   term of a claim must be given meaning.  Innova/Pure Water, Inc. v. Safari Water Filtration

6   Sys., Inc., 381 F.3d 1111, 1119 (Fed. Cir. 2004).  It seems elementary that a "first type

7   network node" would differ from a "second type network node," however Plaintiff defines

8   both terms in the exactly same way, thereby reading the terms "first type" and "second type"

9   out of the claims.  Plaintiff counters that the ordinal number simply indicates that the two

10  "network nodes" described in the claims are not the same nodes.  However, that would

11  obviate the need for the word "type."  To say there is a "first type" and a "second type"

12  suggests that the two network nodes are different in some qualitative way.

13       Furthermore, Plaintiff's construction is vague.  The phrase "computer device" is not

14  used in the Patent, nor does Plaintiff provide any supporting evidence from the claims,

15  specification, file history, or extrinsic sources for its construction.  Rather, the specification

16  provides that "all ICPs, ISPs, and organizations that are connected to it can be deemed as

17  network nodes." '577 Patent 3:53-54.  The only "nodes" referred to by Plaintiff are ICPs,

18  ISPs, and organizations.  Nodes, as commonly defined, could also include a computer or

19  modem.  See Oxford English Dictionary ("node" defined as "a computer or other device

20  attached to a network").  The Court is mindful of the obligation not to import limitations on

21  claim terms from examples given in a specification, but as discussed above, a broad term

22  may be read narrowly if that reading is supported by the intrinsic evidence.  See, e.g.,

23  Netcraft, 549 F.3d at 1397.  Plaintiff's construction is rejected because it significantly

24  broadens the claim terms beyond what was provided for in the specification.

25       In sum, the Court construes "first type network node" as an Internet Service Provider

26  (ISP) or organization from which a service request is received.  A "second type network

27  node" is construed as an Internet Content Provider (ICP).

28

13

C.        "for the first type network node" (Claim 1) & "for the second type network
          node" (Claim 2)

**Plaintiff:**     Claim construction of "for the first type network node" and "for the
                   second type network node" is unnecessary.  The plain and ordinary
                   meaning controls.

                   If the court concludes that "for the first/second type network node"
                   requires construction, then the Court should construe "for the
                   first/second type network node" within the context of the claims to mean
                   "on behalf of one or more computer devices on a computer network."

**Defendant:**     "for the first type network node": Designed for a participating Internet
                   Service Provider (ISP) or organization from which a service request is
                   received.

                   "for the second type network node": Designed for an Internet Content
                   Provider (ICP).

The significant additional term in these phrases is "for."  The Court agrees with
Plaintiff here – the term needs no construction.  "Claim construction is a matter of resolution
of disputed meanings and technical scope, to clarify and when necessary to explain what the
patentee covered by the claims, for use in the determination of infringement."  United States
Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997).  Here, the term "for" is
non-technical, is in plain English, and derives no special meaning from the Patent.  The
ordinary meaning of the term speaks for itself, and the Court will avoid paraphrasing the
language.  The Court finds very little risk that the ultimate factfinder will be unable to
understand this term.

Defendant's proposal is rejected as importing limitations into the specification.  The
Patent, read as a whole, does not support adding the word "designed" in front of "for" in
construing the term.  The specification states both that an ICP forms customized web pages
"for its participating web sites" and that web page files may be "designed for" a network
node.  '577 Patent at Abstract; 7:45-55; 8:55-67.  Defendant claims that forming a web page

14

"for" a network node "is so amorphous as to require guidance from the specification," but the Court is not convinced.  There is no need to inject verbiage into a such a straightforward and ordinary term.

CONCLUSION

Based on the foregoing, the Court hereby:

(1)   Adopts Defendant's construction of "page file," thereby construing the term as "a Web page file, such as an HTML file."

(2)   Construes "first type network node" as an Internet Service Provider (ISP) or organization from which a service request is received, and construes a "second type network node" as an Internet Content Provider (ICP).

(3)   Declines to construe the term "for."

**IT IS SO ORDERED.**

Dated: August 19, 2009                                                    
                                                    CHARLES  R. BREYER
                                                    UNITED STATES DISTRICT JUDGE

<strong>United States District Court</strong><br/>For the Northern District of California